White, J.
The first question arising in this case is, whether the plaintiff in acquiring title to the part of Cedar Point not occupied by the United States, thereby, became invested with the exclusive right to the fisheries in Lake Erie and Sandusky bay, opposite the premises thus acquired.
The plaintiff’s claim is, in substance, that as owner of the land on the lake and bay shore, he has the right to control these fisheries to the middle of the bay and lake.
This claim is sought to be supported upon the doctrine of the common law of England, that in streams above the ebb and flow of the tide, the ownership of soil to the center of the stream is presumed to be in the adjoining proprietor, and that the right of fishing in such stream is not public, but is vested exclusively in the adjoining owners.
Whether the doctrine of the common law, which regards all non-tidal streams, that are in fact navigable, as mere highways, and as uon-navigable in law, is applicable to the condition of things in this country has given rise to much discussion, .and contrariety of decision. In some of the states this doctrine of the common law' is repudiated a3 inapplicable to the circumstances of this country; and streams, without regard'to the ebb and flow of the tide, which are navigable in fact, are i’egarded as navigable in law. Tyler’s law of Boundaries, 58 et seq.; Houck oxt *512 Rivers, chapters 3 and 6, where the subject is discussed and the authorities collected. Railroad Company v. Schurmeir, 7 Wall. 272.
It has, however, been held in this state, as is the case in most of the states, that the owners of lands situate on the banks of fresh-water navigable streams are owners of the beds of the rivers to the middle of the stream, as at common law. Gavit v. Chambers, 3 Ohio, 496. The same doctrine has been recognized in subsequent cases. Lamb v. Rickets, 11 Ohio, 311; Walker v. The Board of Public Works, 16 Ohio, 544.
We are not called on in this case to review the doctrine laid down in Gavit v. Chambers. The question before us is, whether the rule there laid down, as applicable to navigable rivers, applies to the owners of land bounding on Lake Erie and Sandusky Bay. In our opinion, it clearly does not. In The Canal Commissioners v. The People, 5 Wend. 423, Chancellor Walworth said: “ Our large freshwater lakes or inland seas are wholly unprovided for by the law of England. As to these, there is neither flow of the tide nor thread of the stream; and our local law appears to have assigned the shores down to ordinary low-water mark to the riparian owners, and the beds of the lakes, with the islands therein, to the public.” And in Kent’s Commentaries it is laid down that, “in this country our great navigable lakes are properly regarded as public property, and not susceptible of private property any more than the sea.” 3 Kent’s Com. 429, note a.
The doctrine thus stated is fully supported by the adjudged cases. The State v. Gilmanton, 9 N. H. 461; The State v. Company, 49 N. H. 250 ; Fletcher v. Phelps, 28 Vt. 257; Austin v. The Rutland R. R. Co., 45 Vt. 215; Champlain and St. Lawrence R. R. Co. v. Valentine, 19 Barb. 485 ; Ledyard v. Ten Eyck, 36 Barb. 102; The People v. Gutchess, 48 Barb. 656; Wheeler v. Spinola, 54 N. Y. 377 ; West Roxbury v. Stoddard, 7 Allen, 167.
In Seaman v. Smith, 24 Ill. 521, the question was as to the location of a boundary line calling for Lake Michigan *513 in the various deeds in a chain of title. It was held that the line at which the water usually stands, when free from disturbing causes, is the boundary of lands in a conveyance calling for Lake Michigan as a line.
In the opinion it is said : “A grant giving the ocean or a bay as the boundary, by the common law, carries it down to ordinary high-water mark. Costelyou v Brundt, 2 J. R. 357. . . . The principle, however, which requires that the usual high-water mark is the boundary on the sea, and not the highest or lowest point to which it rises or recedes, applies in this case, although this body of water has no appreciable tides. . . '. The portion of the soil which is only seldom covered with water may be valuable for cultivation or other private purposes.”
We are not required in this case to consider any question in regard to the right of a riparian owner to build out beyond his strict boundary line, for the purpose of affording such convenient wharves and landing places in aid of commerce as do not obstruct navigation. It was held in Dutton v. Strong that these rights of the riparian owner apply to the lakes as well as to tide waters. 1 Black, 23. See also Austin v. The Rutland R. R. Co., supra, 25 Vt. 215.
The question here is, whether the right of fishing in the lake and bay is limited to the plaintiff as the proprietor of the shores.
“ Fishery in the sea, and in the waters which are made to flow inland therefrom by its egress and influence, constituting, as it does, a great source of sustentation, has in all ages and in all countries been deemed of such importance that it has ever been regarded a privilege open and common to all persons.” Angelí on Tide Waters, 124.
And although the dominion over and the right of property in the waters of the sea and its inland waters were, at common law, in the crown, yet they were of common public right for every subject to navigate upon and to fish in, without interruption. Id. 21. They were regarded as the inherent privileges of the subject, and “ classed among *514 those public rights denominated jura publica, of jura communia, and thus contradistinguished from jura corona, or private rights of the crown.” Id. 22, 80; Harg. Law Tracts, 11. The sovereign was the proprietor of these waters, as the representative or trustee of the public. In this country the title is vested in the states upon a like trust, subject to the power vested in congress to regulate commerce. Martin v. Waddell, 16 Peters, 367, 412; McCready v. Virginia, 94 U. S. (4 Otto), 391.
That fishery in such waters as Lake Erie and its bays should be as free and common as upon tide waters, and alike subject to control by public authority, is obviously just. The reasons for regarding the right as public is as great in the one case as in the other; and we have no hesitation in saying that the right of fishing in these waters is as open to the public as if they were subject to the ebb and flow of the tide.
The Supreme Court of New Hampshire, in speaking of Lake 'Winnipiseogee say : “ The right of fishing in the lake is not limited to the proprietors of the shore, but is common to all citizens of the state, just as much as the fishing in the tide waters of the Piseataqua.” State v. Company, 49 N. H. 250.
The plaintiff likewise claims a right to the fisheries in question by prescription. It appears from the finding of the master, that from October, 1849, up to the time of making his report, the owners of Cedar Point “ leased the same to sundry persons for fishing purposes, and the fisheries belonging thereto.” And that Cedar Point was regularly under lease during all that time for fishing purposes, except when the owners themselves fished there ; and that the owners controlled the same except when interfered with-by the defendant, and sometimes by other fishermen, during the four or five last preceding years. In the spring of 1866, the defendant ceased to fish under lease from the owners of the Point. At that time he commenced to carry on his fishing operations in his own right; and in the following year, May 4; 1867, the present suit was commenced. *515 Fishing with pounds was commenced about the year 1854. Prior to that time, fishing was carried on with seines used in connection with the shore.
These facts dearly fail to establish a prescriptive right to the fisheries in controversy. The time is insufficient, even if the other facts necessary to support the claim were shown.
The prima facie right of the public is not rebutted by proof of the mere uninterrupted enjoyment of the privilege of fishing for the period requisite to acquire a title by prescription; the mere lawful exercise of a common right for that period never having been considered as conferring an exclusive right. Angelí on Tide Waters, 135, 270 ; D. & M. R. R. Co. v. Stump, 8 G. & J. 497; Chalker v. Dickinson, 1 Conn. 382 ; Id. 510; State v. Company, 49 N. H. 240,
The next question is as to the extent of the reservation contained in the deed from the plaintiff' to the defendant. The reservation is in the following terms :
“And the said grantee shall not have the right to sell or remove sand from said premises, nor shall he have the right of fishing in either the lake or bay, the same being expressly reserved by the said grantor. The said grantee shall have the right, however, of loading on either the bay or lake shore for other purposes than to take sand, fish, or carry to and from seines and fishing tackle, all of which rights are exclusively reserved by the grantor, so that he may lease the same or sell the same.”
The word “ loading,” should doubtless be read “ landing.” Landing is the word used in the contract, in fulfillment of which the deed was made; and the reservation is regarded by counsel as containing the word landing, instead of “ loading,” and it will be so treated by us.
Iir determining the effect of the reservation, it may be remarked, in the first place, that it can operate to reserve to the grantor only such rights as would have passed from him to the grantee by the deed in the absence of such reservation. It does not abridge the rights held by the grantee independent of the deed, nor does it enlarge the rights of *516 the grantor beyond what they were before the execution of the deed. The attempted reservation, in the first clause of the right of fishiug in either the lake or bay, disconnected from the shore, is, therefore, inoperative.
The question is as to the extent of the reservations contained in the last clause. In giving construction to this clause, it is to be observed that all the estate and interest in the land is vested in the grantee, subject only to the rights reserved to the grantor. No right is denied to the grantee, in respect to his use of the land, except in so far as such right is saved to the grantor. The right is denied to the grantee of landing on the bay or lake shore to take sand, fish, or to carry to and from the shore seines and fishing tackle. The right reserved to the grantor, therefore, is the exclusive right of landing on either shore to take sand, fish, or to carry to and from the shore seines and fishing tackle. He can land on or occupy the shore for no other purpose.
It is claimed, on behalf of the defendant, that the reservation is repugnant to the grant, and is therefore void. We do not think so. The rights reserved might be granted by the owner of the premises upon which they were to be exercised; and if they could be granted, there is no reason why they might not be reserved — a reservation being but the equivalent of a grant.
The plaintiff not being entitled to relief in respect to the fisheries, which is the main subject of controversy, the only remaining question is whether there has been such an invasion of his shore rights as to entitle him to a decree for their quiet enjoyment.
We find nothing in the case to show that the plaintiff or his grantee has been prevented from landing on the shore for the purposes specified in the reservation; nor is their right to do so denied by the defendant. He sets up no interest adverse to the rights reserved to the plaintiff.
It appears from the report of the master that at times the fishermen of the defendant live on the premises, and that, in the fishing season, they take their boats, go to the *517 pounds, and lift the fish, which they take to Sandusky, and then return to Cedar Point, and draw their boats on the shore, and x-emain there until the next morning. This course is continued during the fishing season. When the fishing season is over, the boats, stakes, and twine are sometimes stox’ed on the premises.
The right is not x'esexwed to the plaintiff to have his fish-ex’men reside on the premises; nor is there reserved to him any light of storing fishing tackle there. His light to the shox’e is limited to taking sand, fish, and to the carrying to and from the shore fishing tackle to be used for fishing in the adjacent waters in direct connection with the shore. And the inhibition agaixxst the carrying of fishing tackle to and from the shore by the defendant, has reference to tackle to be used in contravention of the right reserved to the plaintiff, and does not refer to the stoxixxg of tackle on the px’emises which is not thus used.
The master’s report also shows that sometimes, when the ice in the bay was unsafe, the fishermen would pull the sleds on which the twine was ashore for safety; and that at one time, in the winter of 1867-8, the defendant helped to draw the twine ashore. Whether the fisherman were authorized, by the defendant, to so use the shore does not appear. He sets up no claim to the use of the shore for such purposes, and in his answer he denies having so used it. The finding, that on one occasion the defendant used the shore for the purpose, is not a sufficient ground on which to found a decree to quiet title. The act is to be regarded rather in the nature of a temporary trespass, than as the assertion of a right. Moreover’, the act of the defendant now in question constituted no part of the cause of action set up in the petition, the act having been done after the commencement of the action.
We find, therefox’e, that the plaintiff is not entitled to the relief px’ayed for, and his petition is dismissed.